IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAJ WALTON, | : | CIVIL ACTION |
|           Plaintiff, | : | |
| | : | No. 13-6896 |
| v. | : | |
| | : | |
| SPHERION STAFFING LLC a/k/a | : | |
| SPHERION STAFFING SERVICES, | : | |
| and TECH DATA CORPORATION, | : | |
| | : | |
|           Defendants. | : | |

MCHUGH, J.                                                                                                     JANUARY 13, 2015

## MEMORANDUM

This case tests the outer bounds of the Americans with Disabilities Act in the context of workplace violence. I am confronted with two competing but equally valid public policy interests—the need for a safe workplace, as weighed against the need to accommodate and treat mental illness. Ruling in favor of the Defendant employer here could discourage employees in crisis from seeking help. On the other hand, ruling for the affected employee could subject employers to a daunting standard, torn between a legal requirement to accommodate mentally ill employees and the moral imperative of providing a safe workplace. On the specific facts of this case, as ably pleaded by Plaintiff's counsel, I am persuaded that this case should proceed with discovery, and so Defendant's Motion to Dismiss will be denied.

### I.     Factual Allegations in Plaintiff's Complaint

Plaintiff Taj Walton commenced employment with Defendant Spherion Staffing LLC ("Spherion") in 2007. Compl. at ¶ 8. Spherion is a staffing agency that places employees in various work assignments. *Id.* at ¶¶ 9–10. In October of 2011, Spherion assigned Plaintiff to the

1

position of Warehouse Worker at Tech Data Corporation ("Tech Data"). *Id.* at ¶ 11.  On or around November 21, 2011, Plaintiff experienced suicidal ideations for the first time while traveling to work at Tech Data. *Id.* at ¶ 13.  After approximately thirty (30) minutes, his suicidal thoughts subsided. *Id.*  The following day, Plaintiff's suicidal thoughts returned, and, in a troubling progression, he experienced homicidal ideations for the first time. *Id.* at ¶ 14. "Recognizing that he needed immediate medical attention," Plaintiff wrote a note to his supervisor, Lizelle Parks, a Spherion staffer on site at Tech Data. *Id.* at ¶ 15.  Plaintiff's plea for help read:

> Lizelle, Please Help Call [telephone number provided] Mom [telephone number provided] Dad The police I'm scared and angry.  I don't know why but I wanna kill someone/anyone.  Please have security accompany you if you want to talk to me.  Make sure, please.  I'm unstable.  I'm sorry Taj."

*Id.* at ¶ 15.  Although Parks was not present at the time of the incident, a Tech Data security guard read the note and called the police. *Id.* at ¶ 16.  Plaintiff subsequently waited outside until the police arrived and drove him to a nearby hospital. *Id.*  He was not restrained while waiting for the police to arrive, and he did not act out or converse with the security guard during that time period. *Id.*

Plaintiff was subsequently diagnosed with depression and advised that he required further medical attention and treatment. *Id.* at ¶ 17.  Based on the limited record before me, it appears that Defendants did not have notice of Plaintiff's disability prior to his hospital visit and diagnosis.[1]  In an effort to follow his physician's advice, Plaintiff attempted to contact Parks and inform her about his diagnosis and intention to seek additional treatment, but he was unable to reach her. *Id.* at ¶ 18.  After numerous failed attempts to connect with Parks, Plaintiff spoke to

---

[1] See Defendant's Motion for Judgment on the Pleadings at 4 n.1 ("Because Plaintiff had not yet been diagnosed with depression [at the time of the November 22, 2011 incident], it follows that Plaintiff had not put anyone with Spherion on notice of his alleged disability prior to expressing his desire to kill someone.").

two employees, "Chris" (last name unknown) and Carlos Hernandez, who each answered the phone at Spherion's Philadelphia office. *Id.* Plaintiff informed Chris and Hernandez that he had been diagnosed with depression and inquired about his medical insurance coverage provided by Spherion. *Id.* at ¶¶ 18–19. Chris and Hernandez directed Plaintiff to discuss his issues with Parks directly. *Id.* at ¶ 19. However, after Plaintiff's efforts to reach Parks continued to be futile, Chris and Hernandez advised him to contact Spherion's headquarters. *Id.* at ¶ 20. On November 23, 2011, Plaintiff called headquarters and notified a human resources ("HR") representative of his disability and need for medical care. *Id.* The HR representative advised Plaintiff to contact Parks and file for workers' compensation benefits, which did not address his ongoing medical issues. *Id.* at ¶ 21.

Plaintiff continued to attempt to contact Parks, who finally responded to him on or about December 11, 2011 via text message. *Id.* at ¶ 22. Parks informed Plaintiff that she was on "intermittent medical leave" and would be in touch upon her return. *Id.* Almost three weeks had now passed since Plaintiff's episode. Plaintiff called Parks once again the next day, at which time she answered the phone and immediately terminated his employment from both Spherion and Tech Data. *Id.* at ¶ 23. Parks informed Plaintiff that his health insurance policy was canceled and he was prohibited from working at any of Spherion's locations. *Id.* at ¶ 24. These actions allegedly prevented Plaintiff from receiving the medical care and treatment he needed. *Id.*

## II.     Discussion

Plaintiff claims that Defendants terminated his employment because of his disability, and failed to make any efforts to accommodate his depression, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq,,* and the New Jersey Law Against

Discrimination ("NJLAD"), N.J.S.A. 10:5-1, *et seq.*. *Id.* at ¶¶ 25–33.  Defendant Spherion ("Defendant") has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), on the ground that the threat of violence took Plaintiff outside the protection of the statutes.

    a. *Rule 12(c) Motion Standard*

A Rule 12(c) motion for judgment on the pleadings "is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Revel v. Port Auth. Of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).  The standard is well-established:  I must view the pleadings in the light most favorable to the non-moving party, including drawing all inferences in favor of the pleader. *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002).  "A Rule 12(c) motion should not be granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 271 (3d Cir. 2014) (internal quotations and citations omitted).

    b. *Legal Analysis*

A superficial review of the record could lead one to jump to the conclusion that Spherion was compelled to act as it did.  But such an analysis would be too facile.  Although Spherion's Motion paints a compelling picture of an employer faced with no choice but to terminate a potentially dangerous employee for misconduct, Plaintiff's account of the same facts stands in stark contrast to that ominous portrayal.  Drawing all reasonable inferences in Plaintiff's favor, a jury could reasonably conclude that Walton did not engage in "wrongdoing" as that term is commonly conceptualized, but rather acted appropriately when facing a mental health episode that left him in an unprecedented situation.

Defendant argues that proclivities towards violence plainly disqualify a disabled person from protection under the ADA and NJLAD.[2] Its brief emphasizes the practical impact on employers confronted with threats of violence, reasoning that it comes as no surprise that "[p]roclivities towards violence and threats toward coworkers are not protected under the ADA" given the horrific incidents of workplace violence that make media headlines far too frequently.[3] *Hamrick v. West Clermont Local School District*, No. 1:05-CV-00509, 2006 U.S. Dist. LEXIS 38165 (S.D. Ohio June 9, 2006) (*citing Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047 (5th Cir. 1998)). From Spherion's standpoint, therefore, the decision to terminate Plaintiff based on his threats was "not only lawful under the ADA and NJLAD (and overwhelming authority interpreting those Acts), but when viewed through the eyes of Plaintiff's potential victims, it was likely required." Defendant's Motion for Judgment on the Pleadings at 10.[4] In

---

[2] The NJLAD is analyzed pursuant to the same analytical framework as the ADA. *McNemar v. Disney Store*, 91 F.3d 610, 618 (3d Cir. 1996).

[3] *See, e.g.,* UNITED STATES DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS*, Census of Fatal Occupation Injuries Summary, 2013* (Economic News Release, September 11, 2014), http://www.bls.gov/news.release/cfoi.nr0.htm) ("Overall, violence accounted for 1 out of every 6 fatal work injuries in 2013. . . . including 397 homicides and 270 suicides. . . . Shootings were the most frequent manner of death in both homicides (80 percent) and suicides (47 percent). Of the 302 fatal work injuries involving female workers, 22 percent involved homicides, compared to 8 percent for men."); Greg Botelho, *Workplace Violence: Know the Numbers, Risk Factors and Possible Warning Signs,* CNN (September 28, 2014), http://www.cnn.com/2014/09/27/us/workplace-violence-questions-answers/ ("In 2013, 397 fatal workplace injuries in the United States were classified as homicides, which works out to 9% of all workplace deaths.").

[4] Defendant emphasizes a frequently cited Seventh Circuit decision opining that an ADA ruling in favor of a potentially dangerous employee "would place the employer on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." *Palmer v. Circuit Court of Cook County Ill.*, 117 F.3d 351, 351–52. *Palmer*'s emphasis on employers' liability risk is surprising and hard to comprehend, in that in the overwhelming majority of jurisdictions, employers would be immune from tort liability in an action brought by an employee, subject only to the far more modest remedy of workers' compensation benefits. *E.g.,* Larson, Arthur and Lex K. Larson, *Larson's Workers Compensation Law*, Vol. 6 at §§ 100 & 103.06 (LexisNexis 2014) (explaining that workers' compensation is generally an exclusive remedy for employees if the injury falls within the coverage of the act, and "a majority of modern cases bar a damage suit against the employer" when an employee assaults a coworker) and at Digest § 103.06D.1 (listing sample citations by jurisdiction).

fact, many employers have issued zero tolerance policies regarding workplace violence as recommended by the Occupational Safety and Health Administration ("OSHA").[5]

A survey of federal case law supports Defendant's argument that a disabled person can be lawfully terminated for disability related misconduct—so long as the employer's explanation is not a pretext for discrimination. *See, e.g.*, *Sever v. Henderson*, 220 Fed. App'x 159, 161 (3d Cir. 2007) ("Though an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability").[6] *Accord Fullman v. Henderson*, 146 F. Supp. 2d 688, 699 (E.D. Pa. 2001) *aff'd*, 29 Fed. App'x 100 (3d Cir. 2002); *Calef v. Gillette Co.*, 322 F.3d 75, 87 (1st Cir. 2003); *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999); *Ward v. Procter & Gamble Paper Products Co.*, 111 F.3d 558, 560 (8th Cir. 1997); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 (9th Cir. 1995); *Den Hartog v. Wasatch Acad.*, 909 F. Supp. 1393, 1402 (D. Utah 1995) *aff'd*, 129 F.3d 1076 (10th Cir. 1997) ("The EEOC has also taken the position that the ADA does not protect disability-caused misconduct.")[7]; *see also*

---

[5] U.S. DEPARTMENT OF LABOR OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, *Workplace Violence OSHA Fact Sheet*, https://www.osha.gov/OshDoc/data_General_Facts/factsheet-workplace-violence.pdf ("The best protection employers can offer is to establish a zero-tolerance policy toward workplace violence against or by their employees."); U.S. DEPARTMENT OF LABOR OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, *Guidelines for Preventing Workplace Violence for Health Care & Social Service Workers*, https://www.osha.gov/Publications/OSHA3148/osha3148.html (recommending that violence prevention programs include a "clear policy of zero tolerance for workplace violence, verbal and nonverbal threats and related actions.").

[6] Although *Sever* deals with claims brought pursuant to the Rehabilitation Act of 1973, claims "of employment discrimination in violation of the Rehabilitation Act are governed by the standards of the Americans with Disabilities Act." 220 F. App'x at 161.

[7] In 1995, the EEOC responded directly to a specific district court case which held that disability-caused misconduct is protected, explaining:

> It appears that the court's analysis in this case is flawed under the ADA. Specifically, the EEOC has consistently maintained that an employer may hold all employees (i.e., those with and without disabilities) to the same conduct standards. . . . Although an employer may be required to provide reasonable accommodation (when requested in advance) so that an individual can meet conduct standards, an employer would not be required to rescind discipline for misconduct.

*Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998) ("No reasonable jury could conclude on the record before us that Salley was fired for his addiction, as opposed to the misconduct Circuit City investigated.").

Defendant's Motion asserts that I should focus my analysis on the term "qualified individual" under the ADA and NJLAD.[8]  A "qualified individual" is defined as an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that s/he holds or desires.  *See Gaul v. Lucent Techs., Inc.,* 134 F.3d 576, 580 (3d Cir. 1998).  Spherion places great emphasis on case law establishing that "[a]n employee who is a direct threat to the safety of himself or others is not a qualified individual with a disability." *Coleman v. Penn. State Police*, No. 11-1457, 2013 U.S. Dist. LEXIS 99609, at *41 (W.D. Pa. July 17, 2013) (internal citations and quotations omitted); *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999); *Palmer*, 117 F.3d at 351–52 (affirming summary judgment in favor of the employer and holding that "[t]he [ADA] protects only qualified employees . . . and threatening other employees disqualifies one.").  Defendant contends that the "face value" of Plaintiff's threats alone are enough to disqualify him from

---

*Den Hartog*, 909 F. Supp. at 1402 (citing Letter from Claire Gonzales, Director of Communications and Legislative Affairs, EEOC, to Honorable John B. Breaux, United States Senate (Jan. 4, 1995)); EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, 1997 WL 34622315 (March 25, 1997); *see also Wolski v. City of Erie*, 773 F. Supp. 2d 577, 591 (W.D. Pa. 2011) ("[I]n a recent publication dealing more specifically with performance and conduct related standards, the EEOC has reiterated that Title I of the ADA 'generally do[es] not impinge on the right of employers to define jobs and to evaluate their employees according to consistently applied standards governing performance and conduct.' ") (discussing U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities*).

[8] Although the primary arguments advanced by Plaintiff and Defendant Spherion propose different legal frameworks under the ADA to resolve the instant Motion, it is unnecessary for me to apply one framework over the other, as case law is consistent in its treatment of disability caused misconduct regardless of "whether plaintiff is viewed as having the burden of showing he posed no threat to safety in order to establish he was otherwise qualified for the job, *see, e.g., id.* at 87 n. 10; *EEOC v. Amego, Inc.,* 110 F.3d 135, 142–44 (1st Cir.1997), or whether defendant is viewed as having the burden of establishing a 'direct threat' as an affirmative defense under 42 U.S.C. §§ 12111(3), 12113(b) and 29 C.F.R. §§ 1630.2(r), 1630.15(b)(2), *see, e.g., Hutton v. Elf Atochem North America, Inc.,* 273 F.3d 884, 893 & n. 5 (9th Cir.2001)." *Rose v. Laskey*, 110 F. App'x 136, 138 (1st Cir. 2004).

ADA protection, regardless of his subjective intent.  *Rose*, 110 Fed. App'x at 137–38 ("[D]efendant cannot be faulted for taking this threat at face value."); *Chapa v. Adams*, 168 F.3d 1036, 1039 (7th Cir. 1999) ("[P]eople who threaten to kill their supervisors are not 'qualified' . . . even if their threats are hollow.").

Plaintiff counters that viewing all facts in the light most favorable to him, his actions did not constitute a threat of workplace violence.  Walton distinguishes the case law on which Defendant relies, maintaining that he did not actually threaten anyone, but apologized for his compromised mental state and expressed a clear desire *not* to engage in any threatening conduct. Plaintiff's note, literally beginning, "Please Help," was rooted in fear ("I'm scared") and intended to protect ("Please have security accompany you"), rather than threaten, his colleagues. Walton avows that his "depression caused him extreme internal turmoil, and he attempted to promote the safest possible atmosphere under the unavoidable circumstances."  Plaintiff's Opposition Brief at 8.  Taking a literal, etymological approach, precisely what is the actual "conduct" in which Plaintiff engaged that Defendants perceived as "mis"-conduct?  As pleaded, the Complaint alleges that in the moment of crisis, Plaintiff neither committed nor threatened violent acts, but rather sought assistance.  Viewed from one perspective, Plaintiff's actions might well exemplify a commendable response to a psychiatric emergency; if all persons overcome with unfamiliar homicidal ideations were able to act as sensitively as Walton, potentially there might be less violence.[9]

---

[9] Defendant argues that Plaintiff's conduct was not ideal, in that he could have abandoned his route to work and gone directly to the hospital or a police station in order to more effectively protect his coworkers and avoid being seen as a workplace threat.  However, given Plaintiff's mental state, expecting him to take preventative actions greater than he did would be demanding a lot.

In declining to dismiss Plaintiff's claim, I am mindful of the fact that as a medical condition, mental illness is frequently misunderstood. Predictable, and in some instances understandable, fear of the mentally-ill can skew an objective evaluation of risk.[10] There is no indication here that Walton had a history of any violent conduct whatsoever, and as set forth above, his individual instinct in the moment of crisis was to seek help, and to be protective of others. More importantly, from the standpoint of workplace violence, termination of an employee is hardly a guarantee of safety. To the contrary, recent history is replete with incidents in which a disgruntled, former employee returned to the worksite, with tragic results.[11]

---

[10] The degree to which a diagnosis of mental illness is related to an increased risk of violent behavior has been the subject of much debate in the psychiatric community. Much of that research has been summarized in an article, Ann Hubbard, *The ADA, the Workplace, and the Myth of the "Dangerously Mentally Ill,"* 34 U.C. DAVIS, L.REV. 849 (2001). One of the largest and most frequently cited studies is the MacArthur Violence Risk Assessment Study, conducted between 1992 and 1995, and published to some acclaim in 1998. H.J. Steadman, E.P. Mulvey, J. Monahan, *Violence by People Discharged from Acute Psychiatric Inpatient Facilities and By Others in the Same Neighborhoods*, ARCHIVES OF GENERAL PSYCHIATRY, 55:393–401 (1998). The MacArthur Study was generally interpreted to support the proposition that individuals with mental health issues, when properly treated, have no greater propensity to commit violent acts as compared to non-mentally ill individuals. The research has continued to be updated, and there remains a debate as to the degree of risk from someone suffering from a mental disorder. *See* E. Fuller Torrey, Jonathan Stanley, and John Monahan, *The MacArthur Violence Risk Assessment Study Revisited: Two Views Ten Years After Its Initial Publication*, PSYCHIATRIC SERVICES, Vol. 59, 147 (February 2008). An objective assessment of the available evidence supports a conclusion that although there can be a statistically increased risk of violent behavior associated with specific severe psychiatric disorders, the individual circumstances and characteristics of each patient, and in particular whether they also engage in substance abuse, play significant roles in any individual case.

[11] *E.g.,* Russell Contreras and Seth Robbins, *FBI Says Shooter at Texas VA Clinic Was Ex-Employee*, PHILLY.COM, http://www.philly.com/philly/news/nation_world/20150107_ap_8b877d2719284f73a5fefb3ecec35df8.html ("An Army veteran who fatally shot a psychologist at a West Texas veterans' hospital before killing himself was a former clerk at the clinic and had threatened the doctor in 2013 . . . "); Meghan Keneally, *Fired Oklahoma Food Plant Employee Beheads Woman, Attacks Another*, ABC NEWS (September 26, 2014), http://abcnews.go.com/US/fired-oklahoma-food-plant-employee-beheads-woman-attacks/story?id=25780332 (discharged employee " 'became angry' after being fired" and drove directly to another work facility where he "beheaded one woman and stabbed another"); Nina Golgowski and Sasha Goldstein, *Three Dead After Uninformed UPS Employee Opens Fire at Alabama Warehouse One Day After He's Fired*, NEW YORK DAILY NEWS (September 23, 2014), http://www.nydailynews.com/news/crime/dead-shooting-alabama-ups-warehouse-article-1.1949495 (where a recently fired UPS worker killed two higher-ranked UPS employees before taking his own life and noting that it appeared "that the shooter knew exactly who he wanted to target at the time"); Desiree Stennett and Orlando Sentinel, *2 Killed, Gunman Dead After North Florida Shooting Spree*, ORLANDO SENTINEL (August 24, 2013), http://articles.orlandosentinel.com/2013-08-24/news/os-florida-shooting-trucking-company-20130824_1_shooting-spree-trucking-company-north-florida ("Three people are dead and two others were critically injured after a disgruntled former employee of a trucking company went on a shooting spree Saturday in a rural North Florida county . . . "); Pei-Sze Cheng, Jonathan Dienst and Shimon Prokupecz, *Two Dead, Nine Hurt in Empire State Building Shooting*, NBC 4 NY (November 14, 2012), http://www.nbcnewyork.com/news/local/Empire-State-

According to the United States Department of Justice, there are approximately 1,000 workplace homicides each year.[12] The United States Department of Labor Workplace Violence Program was designed to reduce the incidents of such tragedies.[13] It is noteworthy, however, that in identifying the threat, the Department focuses on "acts perpetrated by disgruntled co-workers or former co-workers . . . " without distinguishing between them in any meaningful way.[14] In 2012, the United States Merit Systems Protection Board was charged with responsibility for studying violence in federal workplaces, and in its statistical analysis, it did not distinguish between employees and ex-employees.[15] From a policy standpoint, in weighing the equally valid interests presented by this case, a credible argument can be made that *failing* to provide treatment to someone such as the Plaintiff, who has to some degree identified his need for treatment and sought help, would create a greater risk of violence, including violence directed to the employer who denied assistance.[16]

---

Building-Shooting-167313495.html ("A disgruntled former employee shot and killed an ex-coworker outside the Empire State Building before being shot dead by cops").

[12] UNITED STATES DEPARTMENT OF LABOR, *DOL Workplace Violence Program,* http://www.dol.gov/oasam/hrc/policies/dol-workplace-violence-program.htm

[13] *Id.*

[14] *Id.*

[15] A REPORT TO THE PRESIDENT AND THE CONGRESS OF THE UNITED STATES BY THE U.S. MERITS SYSTEMS PROTECTIONS BOARD, *Employee Perceptions of Federal Workplace Violence* (September, 2012) at 18. S*ee also* WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, *Workplace Violence Awareness and Prevention for Employers and Employees*, http://www.lni.wa.gov/IPUB/417-140-000.pdf (defining violence by co-workers as "violence by an assailant who has some employment related involvement with the workplace, for example, a current or *former* employee, supervisor or manager. . . . In committing a threat or assault, the individual may be *seeking revenge* for what is perceived as unfair treatment.") (emphasis added).

[16] Social science research and educational resources from mental health focused non-profit organizations provide support for this hypothesis. *See, e.g.*, "Are People with Serious Mental Illness Who are Not Being Treated Dangerous?" (updated March 2014), *Treatment Advocacy Center Backgrounder*, TREATMENT ADVOCACY CENTER, http://www.treatmentadvocacycenter.org/storage/documents/violent-behavior-backgrounder.pdf (reviewing a variety of psychological studies and concluding that most acts of violence committed by individuals with serious mental illness are carried out when they are not receiving treatment, many of whom are also abusing alcohol or drugs) (citing Witt, K., Van Dorn, R., and Fazel, S., *Risk factors for violence in psychosis: Systematic review and meta-*

As proffered by Plaintiff, if "a disabled employee who asks for help should be automatically terminated, the purpose for enacting the ADA and NJLAD laws is defeated." Plaintiff's Opposition Brief at 10.

*c. Is it plausible that Defendants unlawfully discharged Walton as a result of his disability?*

The ultimate question before me is whether the most favorable reading of the Complaint supports the conclusion that Plaintiff was fired *because of* his disability (i.e., depression). If the only plausible interpretation of the pleadings is that Plaintiff was terminated for misconduct—and not for his disability—then Defendant's Motion should be granted.

On its face, Defendant's portrayal of this case presents a superficially convincing theory that Plaintiff was indeed fired for misconduct, especially when taking into account the fact that Defendants were not on notice about Plaintiff's disability until after the incident in question. Consequently, had Defendants terminated Plaintiff's employment immediately on the day of his perceived crisis, it would seem farfetched that Plaintiff was discharged because of his disability.

But the facts presented are not that simple. Approximately three weeks passed between the incident in question and Plaintiff's termination, during which Plaintiff repeatedly contacted

---

*regression analysis of 110 studies*. PLOS ONE (2013), 8:e55942, and Elbogen, EB, Van Dorn, RA, Swanson, JW, *et al.*, *Treatment engagement and violence risk in mental disorders*, BRITISH JOURNAL OF PSYCHIATRY (2006), 189:354–360, as well as many other studies with comparable findings); "The Criminalization of People with Mental Illness," *NAMI Where We Stand*, THE NATION'S VOICE ON MENTAL ILLNESS, http://www.nami.org/Template.cfm?Section=Issue_Spotlights&template=/ContentManagement/ContentDisplay.cfm&ContentID=76792 ("NAMI [The National Alliance on Mental Illness] believes that, in the overwhelming majority of cases, dangerous or violent acts committed by persons with brain disorders are the result of neglect or inappropriate or inadequate treatment of their illnesses."); "National Disgrace: Millions of Americans with Serious Brain Disorders Go Untreated," *Homelessness, Incarceration, Episodes of Violence: Way of Life for Almost Half of Americans With Untreated Severe Mental Illness*, MENTAL ILLNESS POLICY ORG., http://mentalillnesspolicy.org/consequences/consequences.html (explaining that "[v]iolent episodes by individuals with untreated schizophrenia and manic-depressive illness have risen dramatically, now accounting for at least 1,000 homicides out of 20,000 total murders committed annually in the United States" and listing "serious brain disorder combined with a failure to take medication" as one of three primary predictors of violence; the other two primary predictors listed are: (1) history of violence and (2) drug/alcohol abuse, both of which apply to the general population regardless of mental health status).

his employer to give notice of his disability and resultant need for medical treatment. He even specifically inquired about his insurance coverage, and he was persistent in his efforts to reach his supervisor. Under the Complaint as pleaded, if a genuine threat existed, it had passed, and Plaintiff was actively pursuing treatment that had the potential to control the newly discovered symptoms of his mental illness at the time of his termination. Thus, in viewing all facts and inferences drawn therefrom in the light most favorable to Plaintiff, there is a plausible reading of the Complaint where Plaintiff was discharged as a result of his disability and need for urgent, and presumably expensive, medical attention, rather than as a result of any workplace threat.[17] The considerable lapse in time between Plaintiff's "misconduct" and Defendant's adverse action is critical to my analysis, as it gives life to a viable factual dispute. I am not unmindful of Defendant's contention that they have an obligation to the entire workplace, but on the record before me, a blanket conclusion that the decision to discharge Walton was motivated by his misconduct must be tested by discovery.

---

[17] For a similar analysis and conclusion, *see Wolski*, 773 F. Supp. 2d at 592:

> For purposes of the "qualification standards" defense, it appears that the critical factor in determining whether future accommodation and/or an individualized assessment is required is whether the termination was premised upon past misconduct that violated a workplace standard or, rather, upon perceived safety or performance concerns going forward. Here, the City insists that the "individualized assessment" regulations pertaining to employees who pose a "direct threat" are inapplicable because Wolski was terminated solely on the basis of her past misconduct. However, this assertion merely begs the question whether in fact a jury would be required to find, as a matter of law, that Wolski's termination was premised solely on her own past misconduct or whether, on the contrary, a jury would be justified in finding that her termination was at least partly motivated by the City's generalized concerns relative to her perceived psychiatric disability. On this record at least, we cannot say that the record is so one-sided that a reasonable fact-finder would be precluded from finding that Wolski's perceived disability was a motivating factor in the City's decision to discharge her. Accordingly, the City's motion for summary judgment as to the ADA claim will be denied.

**III.    Conclusion**

Based on the foregoing, I deny Defendant's Motion for Judgment on the Pleadings without prejudice to Defendant Spherion to reassert its arguments on a more fully developed record at summary judgment.  An appropriate order follows.

/s/ Gerald Austin McHugh<br>
United States District Court Judge